IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **RARE BREED TRIGGERS, LLC,** et al., | |
| **Plaintiffs,** | |
| v. | Case No. 23-CV-21-SEH-JFJ |
| **MADISON CRAWFORD, et al.,** | |
| **Defendants.** | |

## OPINION AND ORDER

This matter comes before the Court for construction of certain terms contained in United States Patent No. 10,514,223 (the "'223 Patent"). The Court enters this opinion and order pursuant to *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996) ("Markman I").

### I. Background

#### A. The Parties and the Litigation

The parties all operate in the firearms industry, and this case involves a patent covering a trigger invention. Plaintiff ABC IP, LLC ("ABC") says it owns the '223 Patent. [ECF No. 2 at 4]. Plaintiff Rare Breed Triggers, LLC ("Rare Breed") says it is "the exclusive licensee of the '223 Patent and possesses exclusive rights of the '223 Patent." [*Id.*]. Plaintiffs allege that

Defendants infringed on the '223 Patent by selling competing triggers that are covered by the '223 Patent. The Court ordered the parties to file opening *Markman* briefs no later than December 20, 2023, and to file response briefs no later than January 3, 2024. [ECF No. 60 at 2]. Plaintiffs timely filed their opening *Markman* brief. [ECF No. 72]. Defendants did not file any *Markman* brief, nor did they respond to Plaintiffs' brief. Plaintiffs present two terms for construction:

- "Set position;" and
- "Substantially in-battery position."

[*Id.* at 7].

### B. The '223 Patent

Plaintiffs assert they invented a "drop-in" trigger mechanism that allows users to fire semiautomatic firearms faster than they would with a traditional trigger mechanism. [ECF No. 72 at 6]. In a traditional trigger assembly, a "disconnector allows the firearm to be fired only a single time when the trigger is pulled and held, because the user is not typically able to release the trigger rapidly enough so that the sear engages before the bolt carrier or bolt returns to its in-battery position." *Id.* One of the key design achievements under the '223 Patent, according to the Plaintiffs, is that "it makes the disconnector unnecessary by forcibly returning the trigger to the reset, i.e., in-battery, state." [*Id.*]. This is accomplished "when the bolt carrier

2

or bolt cycles to the rear" of the firearm. [ECF No. 2 at 14]. When that happens, the bolt carrier pushes the hammer back, forcibly resets the trigger, and simultaneously makes the locking bar engage with the trigger to stop it from being pulled again until the locking bar is reset. [*Id.* at 16]. When the bolt carrier moves forward and a new round is moved into the chamber, the bolt carrier "contacts and pivots the locking bar, freeing the trigger to function a second time when pulled again by the user and the firing process is repeated." [*Id.* at 16].

## II.   Applicable Law

"A patent consists of a specification, which includes a detailed description of the invention and the drawings, and one or more claims that appear at the end of the patent." *Hear-Wear Technologies, LLC v. Oticon, Inc.*, No. 07-CV-0212-CVE-FHM, 2016 WL 215273, at *2 (N.D. Okla. Jan. 19, 2016). "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Determination of patent infringement is a two-step process. First, the court "determines the scope and meaning of the patent claims asserted." *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998), *abrogated on other grounds by Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789

F.3d 1335 (Fed. Cir. 2015); *Strattec Sec. Corp. v. Gen. Auto. Specialty Co.*, 126 F.3d 1411, 1416 (Fed. Cir. 1997); *Markman I*, 52 F.3d at 976. This first step is often referred to as the "claim construction" process. Second, the construed claims are compared to the allegedly infringing device or process.[1] *E.g., Cybor Corp.*, 138 F.3d at 1454. The first step—claim construction—is a question of law for the Court to decide. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996) ("Markman II"). The second step—comparing the construed claims to the allegedly infringing device—is a question of fact for a jury to decide. *Id.*

The words and phrases used in claims must be clear, exact, and precise. Claims must also "particularly point[ ] out" and "distinctly" claim the invention. 35 U.S.C. § 112. The claim requirements of 35 U.S.C. § 112 must be adhered to strictly for purposes of enabling the public to determine what subject matter is, and what subject matter is not, within the scope of the patent. The subject matter outside the scope of the patent is free territory to be practiced by everyone in the general public. The public is entitled to rely

---

[1] Courts must ignore the defendant's allegedly infringing device or process when construing claim terms. Only after the claims have been properly construed without any consideration of the alleged infringement, may the construed claims be applied to the defendant's device or process. *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985) ("It is only *after* the claims have been *construed without reference to the accused device* that the claims, as so construed, are applied to the accused device to determine infringement.") (emphasis in original).

4

on the public record, apply the established rules of claim construction, ascertain the scope of the patent, and attempt to design around it. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). Because the public relies on the claims, it is "unjust to the public, as well as an evasion of the law, to construe [claims] in a manner different from the plain import of [their] terms." *White v. Dunbar*, 119 U.S. 47, 52 (1886) (quoted in *Phillips*, 415 F.3d at 1312).

The words of a claim are to be given their "ordinary and customary meaning," which is the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312–13. Claim terms are sometimes obvious even to lay persons, "and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words. . . . In such circumstances, general purpose dictionaries may be helpful." *Id.* at 1314.

However, "it is important to bear in mind that the whole purpose of the claim construction exercise is to discern the meaning a person of ordinary skill in the art would have attributed to a disputed term and then to convey that meaning understandably to a lay jury." *Big D Indus., Inc. v. Fresh Prods., Inc.*, No. CIV-21-211-F, 2022 WL 1017908, at *2 (W.D. Okla. Apr. 5, 2022). In cases where the intended meaning is not apparent, courts look to

"those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean," *Innova/Pure Water, Inc.*, 381 F.3d at 1116, including the patent specifications and the prosecution history. *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term … in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history.") (quoting *DeMarni Sports, Inc. v. Worth*, 239 F.3d 1314, 1324 (Fed. Cir. 2001)). The language, specifications, and prosecution history, collectively, are referred to as "intrinsic evidence."

The patent specifications are relevant to claim construction because the claims are part of "a fully integrated written instrument." *See Phillips*, 415 F.3d at 1315 (quoting *Markman I*, 52 F.3d at 978). So not only is the written description helpful in construing claim terms, but it is "entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." *Id.* at 1317. Although specifications may be helpful in construing the terms of a claim, specifications do not necessarily limit a claim's scope if the claim is written in broad language. *Innova/Pure Water, Inc.*, 381 F.3d at 1117 ("[P]articular embodiments appearing in the written description will not be used to limit claim language that has broader effect. . . . [E]ven where a patent describes

6

only a single embodiment, claims will not be 'read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope.'") (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)).

The prosecution history is relevant because it "provides evidence of how the [USPTO] and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. Although it is "less useful [than the specifications] for claim construction purposes," it "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* If the patentee unequivocally disclaimed or disavowed a certain meaning during the patent approval process, the claim must be narrowed to exclude that meaning. *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005). This ensures that claims are not construed one way to gain approval and another way against accused infringers. *Id.*

Although the Federal Circuit has emphasized the importance of intrinsic evidence in claim construction, district courts may also rely on extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" *Phillips*, 415 F.3d at 1317 (quoting *Markman I*, 52

7

F.3d at 980). "While extrinsic evidence can shed useful light on the relevant art, . . . it is less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)) (cleaned up).

In sum,

> there is no magic formula or catechism for conducting claim construction. Nor is the court barred from considering any particular sources or required to analyze sources in any specific sequence, as long as those sources are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence. For example, a judge who encounters a claim term while reading a patent might consult a general purpose or specialized dictionary to begin to understand the meaning of the term, before reviewing the remainder of the patent to determine how the patentee has used the term. The sequence of steps used by the judge in consulting various sources is not important; what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law.

*Id.* at 1324 (internal citations omitted).

## III.  Discussion

Each of the two terms Plaintiffs present for construction ("set position" and "substantially in-battery position") appear in Claim 4 of the '223 Patent. Claim 4 provides:

> 4. For a firearm having a receiver with a fire control mechanism pocket, assembly pin openings in side walls of the pocket, and a bolt carrier that reciprocates and pivotally displaces a hammer when cycled, a trigger mechanism, comprising:
> > a housing having transversely aligned pairs of openings for receiving hammer and trigger assembly pins;

> a hammer having a sear notch and mounted in the housing to pivot on a transverse axis between **set** and released **positions**;
> a trigger member having a sear and mounted in the housing to pivot on a transverse axis between **set** and released **positions**, the trigger member having a surface positioned to be contacted by the hammer when the hammer is displaced by the bolt carrier when cycled, the contact causing the trigger member to be forced to the **set position**;
> a locking bar pivotally mounted in the housing and spring biased toward a first position in which the locking bar mechanically blocks the trigger member from moving to the released position, and movable against the spring bias to a second position when contacted by the bolt carrier reaching a **substantially in-battery position** in which the trigger member can be moved by an external force to the released position.

[ECF No. 2-1 at 10–11] (emphasis added).

Ordinarily, the Court would compare the competing constructions proposed by the parties. But because only Plaintiffs have presented proposed constructions, and because Defendants have not responded in any way, the Court can only evaluate Plaintiffs' proposed constructions.

### A. "Set Position"

| No. | Plaintiffs' Proposed Construction | Court's Construction |
|---|---|---|
| 4 | Trigger member position when the sear on the trigger member is in the position to engage the hammer sear notch. | Trigger member position when the sear on the trigger member is in the position to engage the hammer sear notch. |

As set forth in Claim 4 of the '223 Patent, there are four key components to trigger mechanisms covered by the '223 Patent: (1) a housing; (2) a hammer; (3) a trigger member; and (4) a locking bar. The proposed definition

9

of "set position" refers to the position of the trigger member, and "set" position is one of two positions contemplated in Claim 4. [ECF No. 72 at 8]. The other position is the "release" position. [*Id.*]. Plaintiffs highlight that the trigger member can be in "set position" both before the firing sequence is initiated by the user *and* during the firing sequence "after the hammer forces it to reset [but] *before* the hammer moves into its set position engaging the sear."[2] [*Id.* at 9] (emphasis added). The key is that unlike traditional trigger mechanisms, "the hammer sear notch generally is not engaged with the trigger member sear at the point when the hammer is forcing the trigger member back into the 'set position.'" [*Id.* at 9].

Stated otherwise, there is a period of time during the firing sequence when the trigger member has been *forced* into a position where the user can pull the trigger again (and the sear has not been engaged), whereas a traditional trigger mechanism requires the user to stop putting pressure on the trigger in order to put it in a position where the hammer sear can engage.

Given that the trigger member can be in "set position" at more than one point during the firing sequence under the '223 Patent, the Court finds it reasonable to define "set position" as being "in the position *to engage* the

---

[2] The sear is the part of the trigger mechanism that holds the hammer back until the user pulls the trigger member, thus beginning the firing sequence. The sear catch is depicted as item 46 in Figures 3–5 of the '223 Patent. [ECF No. 2-1 at 5-7].

10

hammer sear notch," rather than a position where the hammer sear notch is *actually engaged*, as it would be in other trigger mechanisms. Therefore, the Court concludes that Plaintiffs' proposed construction should be adopted. "set position" shall be construed to mean "trigger member position when the sear on the trigger member is in the position to engage the hammer sear notch."

### B. "Substantially In-Battery Position"

| No. | Plaintiffs' Proposed Construction | Court's Construction |
|---|---|---|
| 4 | Position [of the bolt carrier] that is almost or nearly in the forward, ready to fire position, the amount of remaining forward travel being necessary to move the locking bar from its first position to its second position. | Position of the bolt carrier that is almost or nearly in the forward, ready to fire position, after contacting the locking bar and putting it in its second position, the amount of remaining forward travel being necessary to return the bolt carrier to the in-battery position. |

The term "substantially" is a descriptive term that is "commonly used in patent claims to avoid a strict numerical boundary to the specified parameter." *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1310–11 (Fed. Cir. 2003) (internal quotations and citation omitted). Each firing sequence has a definite beginning and end, and there is only one path to complete the firing sequence. Nevertheless, the firing sequence is a fluid movement that could be dissected into infinite points. Therefore, the Court finds it appropriate to construe the term "substantially"

11

here as it relates to the position of the bolt carrier because it is one of the moving pieces that interacts with the trigger mechanism.

Plaintiffs ask the Court to define "substantially in battery position" as the position of the bolt carrier when its remaining forward travel before returning to the in-battery position is necessary to move the locking bar from the first position to the second position. In the Court's view, however, that conflicts with the plain language in Claim 4.

In relevant part, Claim 4 states:

> a locking bar pivotally mounted in the housing and spring biased toward a *first position* in which the *locking bar mechanically blocks the trigger member from moving to the released position*, and movable against the spring bias to a second position *when* contacted by the bolt carrier reaching a substantially in-battery position *in which the trigger member can be moved by an external force to the released position*.

[ECF No. 2-1 at 11] (emphasis added). In the text of Claim 4, the term "substantially in-battery position," which refers to the position of the bolt carrier during the firing sequence, is modified by the phrase "in which the trigger member can be moved by an external force to the released position." *Cf. Facebook, Inc. v. Duguid*, 592 U.S. 395, 404 (2021) (applying the rule of the last antecedent in the context of statutory interpretation). In other words, the bolt carrier cannot be considered to have reached "substantially in-battery position" in the firing sequence until *after* the locking bar is moved into second position and the trigger member can be pulled by the user (*i.e.*

when the trigger member can be "moved by an external force to the released position."). Therefore, by the plain terms of Claim 4, the bolt carrier cannot be in "substantially in-battery position" when it has not yet moved the locking bar into the second position because that action is what allows the trigger member to be moved by an external force to the released position.

For these reasons, the Court rejects Plaintiff's proposed construction of the term "substantially in-battery position." The term "substantially in-battery position" shall be construed as meaning "position of the bolt carrier that is almost or nearly in the forward, ready to fire position, after contacting the locking bar and putting it in its second position, the amount of remaining forward travel being necessary to return the bolt carrier to the in-battery position."

## IV. Conclusion

IT IS THEREFORE ORDERED that the terms Plaintiffs presented for construction under the '223 Patent are construed as follows:

- "Set position" is construed as "trigger member position when the sear on the trigger member is in the position to engage the hammer sear notch."

- "Substantially in-battery position" is construed as "position of the bolt carrier that is almost or nearly in the forward, ready to fire position, after contacting the locking bar and putting it in its second position, the

13

amount of remaining forward travel being necessary to return the bolt carrier to the in-battery position."

**IT IS SO ORDERED** this 21st day of June, 2024.

*Sara E. Hill*
Sara E. Hill
UNITED STATES DISTRICT JUDGE